**Billy Ray HARDIN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–35.**

Court of Criminal Appeals of Oklahoma.

Sept. 22, 1975.

S. Thomas Coleman, Jr., Asst. Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Presiding Judge:

The appellant, Billy Ray Hardin, hereinafter referred to as defendant, was charged with the crime of Murder in the First Degree in District Court Case No. CRF–74–607, Tulsa County. He was found guilty of Manslaughter in the First Degree, and sentenced to serve a term of ninety-eight (98) years' imprisonment.

The facts, as they were related at trial, chronologically, are these: Late in the evening of March 6, 1974, the defendant went to the West 40 Bar in Tulsa County and stayed until that establishment closed at approximately 12:10 a. m. He was a regular customer there, and acquainted with the owner, Naomi Tindle, who was the wife of the deceased, Robert Tindle. Shortly before the evening in question, the Tindles had separated. Prior to that separation, Naomi Tindle had lived with her husband in a trailer house located behind the bar. Robert Tindle continued to live there. Jeanie Luellan, who was employed by Mrs. Tindle as a barmaid at the West 40 Bar, testified that it was her habit before Mrs. Tindle had moved from the trailer to put the evening's receipts into a bag at closing time and to deliver the bag to the trailer. Mrs. Tindle testified that the defendant knew that the money was routinely taken to the trailer after the bar closed. Jeanie

Luellan testified that the defendant watched her put the money into a bag as she prepared to close on that evening. She stated that when it was time to lock the bar for the night the defendant left by the front door and she went out the rear. Shortly, she saw him approach the darkened trailer and knock at the door.

Richard Clyde Wasson, a friend of the defendant, testified that on the evening in question sometime near midnight the defendant sought him out at a restaurant where he was employed and asked him to accompany him to the West 40 Bar. The defendant told Wasson that he intended to engage his brother in a fistfight and needed Wasson's help. Wasson agreed to go and the two men persuaded one John Mathes to give them a ride as far as an intersection located near the bar. Wasson testified that as they rode along the defendant handed him a knife with the admonition that he would need it later. Wasson refused to take it. Wasson testified that as they approached the bar, after being let out of the automobile, he noticed that the lights were off in that establishment and there were no cars parked near it. As they approached the trailer behind the bar, Wasson noticed that it too was dark. The defendant instructed Wasson to knock on the front door while he went to the rear of the trailer. Wasson knocked on that door for some time. Inside the trailer he heard a squeaking noise such as the springs of a bed or a couch might make in response to a person's weight, and then he heard footsteps approaching the door. No one opened the door, however, and instead Wasson heard a choking noise, a gagging for air coming from within. He turned the handle but the door was locked. Some minutes later, during which Wasson heard thumping and banging noises coming from within, the door was unlocked and he went inside the trailer. It was dark inside the trailer, the only light coming from outside. Through the gloom, Wasson saw a man half reclining on the floor. He was dressed in boxer shorts and a T shirt. There was a dark stain on the T shirt and the man's face was swollen and appeared

to be wet with blood. The man was repeating "Why are you doing this Bill, why are you doing this?" When the man attempted to get up, Wasson stated, the defendant kicked him in the face and told him to lie there. At that moment the defendant turned toward Wasson and told him that the money was in the bedroom. Wasson replied that he "did not want anything to do with it." (Tr. 135) The defendant then began to choke his victim saying, as Wasson testified, "oh God, I got to do it, I don't want to go to the penitentiary." (Tr. 136) After a vain attempt to pull the defendant away, Wasson walked toward the door. As he did so he looked back and saw the defendant's hand moving up and down and heard a thumping noise. The two men were separated only briefly. Fifteen minutes later Wasson found the defendant on the highway. The defendant was covered with blood and told Wasson, "I think I killed him, I killed him." (Tr. 140) Wasson testified that he and the defendant proceeded to invent a story to excuse the killing. They agreed to say that the defendant had been invited to the trailer to play cards; that Tindle greeted him in a rage, accusing him of an adulterous relationship with Naomi Tindle and attacked him with a knife; and, finally, that the defendant's attack upon Tindle was an act of self-defense and done with a knife taken from Tindle himself. Next the defendant made a telephone call to one Bertha Carlisle who, accompanied by the defendant's wife, came for the defendant and Wasson in her automobile and drove them both to her house. It was there that the defendant handed Wasson a billfold and told him to get rid of it. Wasson testified that he left to go to his sister's house and on the way threw the billfold in a drainage ditch. Later that night Wasson was arrested and interrogated. He testified that he first told police officers the fabricated story that he and the defendant had agreed upon but that later, after talking to his attorney, he admitted the original story was false and told the police the truth.

Subsequently, Wasson led the police to the drainage ditch where he had thrown the billfold. The billfold was recovered and was identified at trial by Naomi Tindle as the property of her deceased husband.

Officer Arvil R. Stinnett, Jr., of the Sand Springs Police Force, testified that at approximately 2:30 on the morning of March 7, 1974, he was called to the house of Bertha Carlisle where he found the defendant. The defendant told him that he had become involved in a fight and had stabbed a man whom he feared might be dead. At the officer's request, the defendant accompanied him to the West 40 Bar. He also contacted the County Sheriff's Office and requested that that office dispatch a car to the same location. The Deputy Sheriff thus summoned entered the trailer and found the body of Robert Tindle on the floor.

The Deputy Sheriff who transported the defendant to jail and who subsequently arrested Richard Wasson testified that on the way to jail the defendant told him that Tindle accused him of misconduct with Tindle's wife, that he pulled a knife, that a fight ensued, and that he, the defendant, took the knife away and stabbed Tindle once in the chest. He also testified that when he arrested Richard Wasson, Wasson told him essentially the same story.

Dr. Robert Fogel testified that his autopsy on the body of Tindle revealed that in addition to bruises and lacerations about his face, the deceased had suffered nine stab wounds of his chest, five of which penetrated the heart itself. Dr. Fogel also testified that the deceased had been severely intoxicated prior to his death.

Five witnesses testified on behalf of the defendant, including the defendant himself. Only the testimony given by the defendant himself contradicted that of the State's witnesses. The defendant admitted stabbing the deceased but asserted that it was done in self-defense after Tindle attacked him with a knife.

██ In defendant's first proposition he argues that the trial court committed error in instructing the jury upon the crime of Murder in the First Degree for the reason

that there was insufficient evidence to support that charge. He argues that, although convicted of the lesser offense of Manslaughter, he was prejudiced by the giving of an instruction on the crime of Murder in the First Degree for the reason that such an instruction created an atmosphere in the jury room in which the jury was both more likely to convict and having convicted more likely to assess a severe penalty. We do not reach the question of whether the defendant, convicted of the lower degree of the offense, was prejudiced by the giving of an instruction on the higher degree because we find that the giving of the instruction on Murder in the First Degree was not error. There was evidence which, if believed, tended to show that defendant's homicidal act was done without authority of law and with a premeditated intent to kill during the commission of an armed robbery. Upon this record whether the defendant was guilty of Murder in the First Degree under 21 O.S. 1973 Supp., § 701.1, paragraph 2, was for the consideration of the jury.

■ The defendant, in his second proposition, contends that the trial court erred in permitting the State to make improper comments during its closing argument to the jury. An examination of the record discloses that no objection to the remarks was taken at the time they were made. The rule we have consistently adhered to is stated in *Robison v. State*, Okl.Cr., 430 P.2d 814, 818 (1967):

"[W]hen objectionable statement is made by the prosecution, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event that the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial. When this is not done the matter cannot be presented for the first time in the Motion for New Trial and in the Petition-in-Error and briefs on appeal. In the event counsel for the defendant considers the remarks so fundamentally prejudicial that the court cannot, by instructions to the jury, correct such error, counsel for defendant should move for a mistrial and preserve this in his Motion for a New Trial."

The remarks complained of in this case are neither so shocking nor so manifestly prejudicial as to require us to depart from this general rule.

For the above and foregoing reasons the judgment and sentence appealed from is *affirmed.*

BUSSEY, J., specially concurs.

BLISS, J., concurs.

BUSSEY, Judge (specially concurring):

The evidence adduced by the State in the instant case was sufficient to submit to the jury the question of the defendant's guilt of Murder in the First Degree as alleged in the Information. In light of the evidence offered by the defendant that he committed the homicide while acting in necessary self-defense, it was likewise necessary for the trial court to instruct the jury on the lesser included offense of Manslaughter in the First Degree, and as we said in the case of *Morgan v. State*, Okl.Cr., 536 P.2d 952:

"We, therefore, further hold, that in every future prosecution for murder, wherein the evidence necessitates an instruction upon self-defense, the trial court shall also instruct upon voluntary or first degree manslaughter committed in the heat of passion as a lesser included offense. This instruction need not be requested and should be given irrespective of an objection thereto. . . ."

Clearly, in the instant case, the jury did not believe the evidence offered on behalf of the State in support of the charge of Murder in the First Degree, nor did they believe that the defendant should be acquitted on the complete defense of self-defense. Rather, under the facts presented they determined, as was their duty, that the defendant was guilty of Manslaughter in the First Degree.